**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA – LAS VEGAS DIVISION**

| | |
|---|---|
| PETER D'ARCY, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>NEVADA GOLD & CASINOS, INC., WILLIAM J. SHERLOCK, WILLIAM G. JAYROE, FRANK CATANIA, FRANCIS M. RICCI, RUDOLPH K. KLUIBER, and SHAWN W. KRAVETZ,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Peter D'Arcy ("Plaintiff"), through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This is a stockholder class action brought by Plaintiff on behalf of himself and the other public stockholders of Nevada Gold & Casinos, Inc. ("Nevada Gold" or the "Company") (other than Defendants outlined below), against the Company and its Board of Directors (the "Board" or "Individual Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") in connection with the proposed acquisition (the "Proposed Buyout") of Nevada Gold by Maverick Casinos LLC and its affiliates (collectively, "Maverick").

2. On September 18, 2018, the Board caused the Company to enter into a definitive arrangement agreement (the "Merger Agreement") with Maverick, pursuant to which Nevada Gold will become an indirect wholly-owned subsidiary of Maverick and each share of Nevada Gold common stock will be converted into the right to receive $2.50 in cash subject to certain

adjustments.[1]

3. In order to convince Nevada Gold's stockholders to vote in favor of the Proposed Buyout, the Board authorized the filing of a Schedule PREM14A proxy statement with the Securities and Exchange Commission on or about December 3, 2018 (the "Proxy Statement" or "Proxy"), which contains, in violation of Sections 14(A) and 20(a) of the Exchange Act, incomplete and materially misleading information regarding: (a) the financial projections for Nevada Gold; (b) the financial analyses conducted by the Company's financial advisor, Rossoff & Company, LLC ( "RCO"), in connection with the Proposed Buyout; and (c) the process that resulted in the Proposed Buyout.

4. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Buyout unless and until the material information discussed below is disclosed to Nevada Gold stockholders before the vote on the Proposed Buyout or, in the event the Proposed Buyout is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.

---

[1] The total Merger Consideration will be (i) adjusted up or down to the extent the net working capital and closing cash adjustments (the "Club Fortune Working Capital Adjustment) under the Asset Purchase Agreement dated as of June 26, 2018 (the "Club Fortune Asset Purchase Agreement"), by and among Truckee Gaming, LLC, Nevada Gold & Casinos LV, LLC, and the Company, as preliminarily determined as of the closing of the sale of the Company's Club Fortune Casino is greater or less than $146,000, and (ii) increased by the amount, if any, that the Cash Closing Payment (as defined in the Club Fortune Asset Purchase Agreement) exceeds $14.6 million for any reason other than on account of the Club Fortune Working Capital Adjustment.

6. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

### A. Plaintiff

8. Plaintiff is, and at all relevant times was, a continuous owner of Nevada Gold common stock.

### B. Defendants

9. Defendant Nevada Gold & Casinos, Inc. (previously defined as "Nevada Gold") is a corporation organized and existing under the laws of the State of Nevada with its principal executive offices located at 133 E. Warm Springs Road, Suite 102, Las Vegas, Nevada 89119. Shares of Nevada Gold common stock are traded on the New York Stock Exchange ("NYSE") under the symbol "UWN."

10. Defendant William J. Sherlock ("Sherlock") has served as Chairman of the Company's Board since November 2009.

11. Defendant William G. Jayroe ("Jayroe") has served as a director of the Company since September 1995. He also served as the Company's Corporate Secretary from March 1999 until June 2001.

12. Defendant Frank Catania ("Catania") has served as a director of the Company since October 2009.

13. Defendant Francis M. Ricci ("Ricci") has served as a director of the Company since July 2003.

14. Defendant Rudolph K. Kluiber ("Kluiber") has served as a director of the Company since October 2016.

15. Defendant Shawn W. Kravetz ("Kravetz") has served as a director of the Company since October 2016.

16. Defendants Sherlock, Jayroe, Catania, Ricci, Kluiber, and Kravetz form the Board of Directors of Nevada Gold and are collectively referred to herein as the "Board" or the "Individual Defendants." Each of the Individual Defendants at all relevant times had the power to control and direct Nevada Gold to engage in the misconduct alleged herein.

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Nevada Gold (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

18. This action is properly maintainable as a class action.

19. The Class is so numerous that joinder of all members is impracticable. As of September 17, 2018, there were approximately 16,848,182 outstanding shares of Nevada Gold common stock. The actual number of public shareholders of Nevada Gold will be ascertained through discovery.

20. Questions of law and fact are common to the Class, including, among others:

a. Whether Defendants have misrepresented or omitted material information concerning the Proposed Buyout in the Proxy Statement in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b. Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

c. Whether Plaintiff and other members of the Class will suffer irreparable harm if the Proposed Buyout is consummated as presently anticipated.

21. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

22. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

23. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### A. Relevant Corporate Background

24. Nevada Gold was formed in 1977 and, since 1994, has been primarily a gaming company involved in financing, developing, owning, and operating gaming properties and

projects. The Company's current gaming facility operations are located in Washington State and Nevada. The Company operates nine mini-casinos in Washington State, which include restaurants, bars, and approximately 125 table games. The Company also operates Club Fortune Casino ("Club Fortune"), located in Henderson, Nevada. It has approximately 405 slot machines, seven table games and a poker room, two bars, an entertainment lounge, a William Hill sports book, a café, a snack bar, and a gift shop.

25. On March 19, 2018, the Company announced favorable results for the nine-month period ending January 31, 2018. Specifically, Nevada Gold's net revenues were $56.1 million, compared to $54.6 million in fiscal year 2017. Operating expenses were $54.1 million, compared to $54.7 million in the prior period. In addition, operating income was $2.0 million, compared to an operating loss of $0.1 million in fiscal 2017; net income was $1.0 million, compared to net loss of $0.6 million in the prior year; and adjusted EBITDA was $3,923,325, compared to $3,597,030 in the prior year.

26. On May 23, 2018, the Company announced it had entered into an agreement to sell its South Dakota Route operation for $400,000. The sale included all fixtures, equipment, trade names, and operating agreements used in connection with such business, but excluded all cash in excess of $400,000. According to the Company, the proceeds from the sale were to be used to decrease Nevada Gold's outstanding debt.

27. Similarly, on June 27, 2018, the Company announced it had entered into a definitive agreement to sell Club Fortune for just $14.6 million in cash, after having acquired the casino in May 2015 for $14.2 million in cash and 1.2 million shares of the Company's common stock. In commenting on the sale, Mr. Sherlock, Chairman of the Company, stated: "This transaction is a part of our continuing program to maximize value for shareholders. We continue to review strategic options, including the review of alternatives for the use of the cash proceeds from the sale

of Club Fortune, which could involve, among other things, repayment of debt, the return of some or all of the cash to shareholders through a special dividend and/or self-tender offer." Despite these remarks and the Company's favorable financial performance that preceded them, less than three months later, the Company entered into the Merger Agreement with Maverick.

28. Managed and majority owned by Eric Persson, Maverick Casinos LLC was formed for the purpose of entering into the Merger Agreement and consummating the transactions contemplated thereby. Eric Persson is also a Manager of, and holds the largest percentage membership interest in, Maverick Gaming. Maverick Gaming owns the Wendover Nugget Hotel & Casino and Red Garter Hotel & Casino in Wendover, Nevada, along with various other assets.

**B. Events Leading to the Proposed Buyout**

29. According to the Proxy, in January 2018, Nevada Gold was approached by and engaged in discussions with a potential buyer of the Company ("Bidder 1"). On February 12, 2018, Bidder 1 proposed to the Company that the parties enter into a transaction pursuant to which it would acquire the Company for a purchase price equal to $3.00 per share conditioned upon (x) the Company shutting down its South Dakota slot route business, and (y) the Company placing Club Fortune in trust pending its sale to a third party. Bidder 1 requested a 60-day exclusivity period to complete its due diligence and negotiate definitive documentation with respect to the transaction with the Company.

30. On February 13, 2018, the Company, through RCO, presented Bidder 1 a counter-offer, proposing a purchase price of $3.15 per share for all of the outstanding Company Shares and outstanding options and a 45-day exclusivity period. In response, that same day, Bidder 1 agreed orally to acquire the Company at a purchase price of $3.10 per share, and on February 14, 2018, Bidder 1 submitted a non-binding proposal to acquire 100% of the outstanding Company Shares (including shares underlying in-the-money stock options) at a per share price of $3.10 (the "Bidder

1 LOI"), which it said was its best and final offer (the "Second Proposal"). Like the initial proposal, the Second Proposal was conditioned upon, among other things, (x) the Company shutting down its South Dakota slot route business, and (y) the Company placing Club Fortune in trust pending its sale to a third party. Likewise, as it had previously requested, the Bidder 1 LOI included a provision granting Bidder 1 a 60-day exclusivity period during which time Bidder 1 would complete its due diligence.

31. The Board, by unanimous vote, approved the Second Proposal that same day, despite the fact that its financial advisor, RCO, was not formally retained to assist the Board with its review of the Company's strategic alternatives, including a possible sale of the Company to Bidder 1 or other third parties, until the following day.

32. In March 2018, in connection with the possible transaction with Bidder 1, the Company commenced a process seeking possible buyers of Club Fortune. Pursuant to another engagement agreement between the Company and RCO, dated March 20, 2018, the Board retained the financial advisor to assist it with the possible sale of Club Fortune, and, at the direction of the Board, RCO commenced contacting potential parties that the RCO believed might be interested in its potential acquisition. This process resulted in the Company receiving bids from three bidders, including a bid from Truckee Gaming, LLC ("Truckee Gaming"), on April 8, 2018.

33. On April 13, 2018, Nevada Gold and Bidder 1 agreed to extend the 60-day exclusivity period previously granted to Bidder 1 pursuant to the Bidder 1 LOI, which was scheduled to end on April 16, 2018, to May 31, 2018.

34. On April 30, 2018, the Company signed a letter of intent with Truckee Gaming providing for the sale of substantially all of the assets related to Club Fortune to Truckee Gaming for $15.5 million. The letter of intent provided that the Company would not be required to complete the transaction if the closing of the sale of the Company to Bidder 1 was not consummated.

Pursuant to the letter of intent, the Company agreed that it would not enter into discussions with other parties for the purchase, lease, or disposition of Club Fortune for a period of 45 days from the date of the letter of intent.

35. Also on April 30, 2018, a potential buyer of the Company ("Bidder 2") sent an unsolicited letter to the Board proposing a merger of Bidder 2 with the Company. Bidder 2 offered to exchange shares of its common stock for all of the Company Shares at an exchange ratio of 0.65 share of Bidder 2 shares for each outstanding Company share, with an implied price of $2.10 per share based on Bidder 2's share price at that time ("Bidder 2 Initial Proposal"). The Company, through RCO, informed Bidder 2 that it was not in a position to discuss the proposal at that time.

36. On May 2, 2018, the Company publicly announced that it was in exclusive discussions to sell the Company.

37. Following discussions and negotiations with Michael J. Trucano, on May 8, 2018, the Company agreed in principal to sell its South Dakota route operation to Mr. Trucano for $400,000 in cash.

38. But, on May 22, 2018, Bidder 1 informed the Company that it had concluded its due diligence and had determined to not to move forward with a transaction with the Company and released the Company from its obligation to negotiate exclusively with Bidder 1 concerning the possible transaction.

39. At a meeting of the Board that same day (the "May 22 Board Meeting"), following the termination of the Bidder 1 LOI, the Board discussed whether to engage in a broad-based review of the strategic and financial alternatives available to the Company, including, a full range of strategic, operational and financial alternatives, which might include a sale or other transaction, in order to maximize stockholder value (the "Strategic Review Process"). Following that discussion, the Board unanimously approved the undertaking of the Strategic Review Process and

authorized RCO to contact Bidder 2 to inform it that it no longer was in exclusive discussions to sell the Company and invite Bidder 2 to participate in the Strategic Review Process. The Board also authorized and instructed RCO to commence contacting other potential parties that the directors, management, and RCO believed might be interested in a potential acquisition of the Company.

40. On May 23, 2018, the Company finalized and entered into an Asset Purchase Agreement with Michael J. Trucano to sell its South Dakota route operation, including all fixtures, equipment, trade names, and operating agreements used in connection with such business, but excluding all cash in excess of $400,000, to Mr. Trucano, for $400,000 in cash.

41. Throughout the period from May 23, 2018 to August 3, 2018, the Company continued to engage in the Strategic Review Process. Specifically, RCO contacted on behalf of the Company 117 parties, eight of which (including Maverick Gaming and Bidder 2) executed non-disclosure agreements with the Company and seven of these bidders (again including Maverick Gaming and Bidder 2), were given copies of an information memorandum prepared by the Company and access to an electronic data room with certain other diligence materials regarding the Company.

42. At a meeting of the Board on June 6, 2018 ("June 6 Board Meeting"), RCO reported that Truckee Gaming remained interested in acquiring Club Fortune, but that the purchase price under the terms previously discussed by the parties would ratchet downward as a result of Club Fortune's recent operating results and the formerly agreed upon EBITDA adjustment to the purchase price. The Board unanimously agreed that a sale of Club Fortune at a favorable price to the Company would be in the best interests of the Company and would likely have a positive effect on the overall Strategic Review Process regardless of whether the Board ultimately determined to pursue a sale of the Company or to continue to pursue its current business plan, including a possible

restructuring of the Company, or otherwise. The Board instructed RCO to notify Truckee Gaming that the Company was prepared to move ahead with the sale of Club Fortune on an expedited basis for $15 million with no upward or downward EBITDA adjustment. Notably, the Board elected to proceed with the sale of Club Fortune on an "expedited basis" despite the facts that two other bidders had previously provided bids to the Company for the purchase of Club Fortune (which bids are not disclosed in the Proxy) and the Company had not yet bothered to gauge the interest of Maverick, or any other potential bidders for that matter, in acquiring the Company without its Club Fortune asset (as noted below).

43. At the June 6 Board Meeting, the Board also reviewed and discussed with RCO the report that RCO had prepared, at the request of the Board, and provided to the Board in advance of the June 6 Board Meeting, which set forth an analysis of the probable impact, including forecasted stock valuations, of a restructuring of the Company on a stand-alone-basis, assuming the disposition of Club Fortune and the relocation of the Company's headquarters to the State of Washington. Critically, the Proxy does not appear to disclose this analysis or its conclusion (the "June 6 Analysis").

44. On June 8, 2018, the Company entered into a non-disclosure agreement with Bidder 2.

45. On June 12, 13, and 19, 2018, the Company entered into non-disclosure agreements with three of its major stockholders ("Stockholder 1", "Stockholder 2", and "Stockholder 3", respectively), in order to permit the Company to share with each of them certain confidential information concerning the Company, including information related to the Strategic Review Process. The Proxy fails to disclose whether and to what extent this confidential information included the June 6 Analysis.

46. On June 20, 2018, after being informed that any sale of the Company would exclude Club Fortune, Maverick Gaming delivered a letter to the Company in which it (a) proposed to acquire all of the outstanding Company Shares for an aggregate cash purchase price of $40 million (approximately $2.36 per share) and (b) **objected to it being restricted from not making a bid for the entire Company, including Club Fortune, and threatened to speak directly to the Company's stockholders regarding a possible takeover of the Company and/or to make a takeover offer directly to the Company's stockholders.**

47. Nonetheless, on June 26, 2018, the Company entered into and publicly announced an Asset Purchase Agreement by and among Truckee Gaming, Nevada Gold & Casinos LV, LLC, and the Company, to sell Club Fortune to Truckee Gaming for $14.6 million, subject to certain adjustments, including a working capital adjustment. The Company also announced that, following the consummation of the sale of Club Fortune, it intended to close its Las Vegas corporate office and move its corporate headquarters to its Washington State office in the Seattle, Washington area. And, on June 30, 2018, the Company completed the sale of its South Dakota route operations to Mr. Trucano in accordance with the terms of the SD Route Operation APA.

48. On July 11, 2018, the Company announced that, effective upon the closure of the Company's Las Vegas corporate office and relocation of its headquarters to the Seattle Washington area, Victor Mena, Vice President of the Company's Washington operations, would succeed Michael Shaunnessy as President and Chief Executive Officer of the Company.

49. On July 19, 2018, Bidder 2 delivered a notice to the Company, in accordance with the advance notice provisions contained in the Company's bylaws, as to the nomination by Bidder 2 of two nominees for election to the Board at the 2018 annual meeting of the stockholders of the Company.

50. On July 24, 2018, the Board instructed RCO to contact representatives of Bidder 2 and Maverick and solicit from them their best and final proposals. The response from Bidder 2 was not considered adequate by the Board, while the response Maverick was of interest, subject to the receipt from Parent of a letter of intent that addressed principal transaction terms and availability of financing. The Proxy fails to disclose the substance and nature of Bidder 2's response, and whether it included a proposed price. This information is especially material in light of the Proxy's selective disclosure of the implied price of the Bidder 2 Initial Proposal, and the fact that, as noted below, the Company would ultimately disclose – but only to certain stockholders – Bidder 2's best and final proposed price.

51. On July 26, 2018, Parent delivered a non-binding letter of intent to the Board of Directors (the "Maverick Letter of Intent"), pursuant to which it proposed to acquire the outstanding shares of common of the Company for $2.50 per share, subject to certain minor adjustments. Included with the proposal was a "highly confidential letter" from Parent's proposed debt financing source. The letter of intent included a proposed 60-day "no-shop" period during which time the Company would be prohibited from negotiating or entering into any agreement with another party involving the sale of the Company and the parties would use reasonable efforts to negotiate a definitive merger agreement and Parent and its financing sources would complete their due diligence.

52. At a meeting of the Board of Directors on August 3, 2018 (the "August 3 Board Meeting"), following a presentation by RCO in which it (a) reviewed with the Board of Directors, among other things, the status of the Strategic Review Process and discussions to date with potential bidders for the Company and Parent's offer as set forth in the Maverick Letter of Intent; and (b) provided the members of the Board of Directors with certain information regarding Parent and its proposed financing of the possible transaction, as well as its evaluation of the offered

consideration, and due consideration of other strategic and financial alternatives available to the Company, the Board unanimously approved and authorized the Company to execute the Maverick Letter of Intent and following such execution, to publicly announce that the Company was in exclusive discussions to sell the Company. The Board of Directors also instructed RCO and the Company's legal counsel to commence negotiations of a definitive merger agreement with Parent.

53. Following the August 3 Board Meeting, the Company publicly announced that it was in exclusive discussions to sell the Company.

54. On August 14, 2018, the Company entered into a non-disclosure agreement with another of its major stockholders (referred to herein as "Stockholder 4"), in order to allow the Company to share with Stockholder 4 certain confidential information concerning the Company, including information related to the Strategic Review Process. Again, the Proxy fails to disclose whether and to what extent this confidential information included the June 6 Analysis, or updated versions thereof.

55. On September 5, 2018, representatives of the Company informed Stockholder 1, Stockholder 2, Stockholder 3, and Stockholder 4 in separate discussions of the highest and best offers received to date from Maverick and Bidder 2 with respect to the possible sale of the Company. Each of them told the representatives of the Company that they were in favor of proceeding with a transaction with Maverick on the terms outlined to each of them. The Proxy fails to disclose whether the Board sought input from these stockholders on whether and to what extent they were in favor of proceeding on a stand-alone basis in lieu of a sale.

56. At a meeting of the Board on September 17, 2018, RCO rendered to the Board its opinion that the consideration to be received by the Company's stockholders pursuant to the Merger Agreement was fair, from a financial point of view, to the Company's stockholders. Following additional discussion and deliberation, the Board unanimously

(a) determined that the merger contemplated by the Merger Agreement was fair and in the best interests of the Company and its stockholders, (b) adopted resolutions approving and declaring the advisability of the Merger Agreement and the merger and other transactions contemplated by the Merger Agreement. Concurrently with the execution of the Merger Agreement, upon the terms and subject to the conditions set forth in the merger agreement, pursuant to Chapters 78 and 92A of the Nevada Revised Statutes, and (c) on the terms and subject to the conditions set forth in the Merger Agreement, resolved to recommend that the Company's stockholders approve the Merger Agreement.

57. On September 18, 2018, the parties executed the Merger Agreement and Nevada Gold issued a press release announcing the Proposed Buyout, which states in pertinent part:

**Nevada Gold & Casinos Announces Sale / Merger Agreement**

> LAS VEGAS, NV - September 18, 2018 — Nevada Gold & Casinos, Inc. (NYSE MKT: UWN) today announced the signing of a definitive merger agreement with Maverick Casinos, LLC ("Maverick"). Under the terms of the merger agreement, Maverick will acquire all of the outstanding shares of the Company's common stock for $2.50 per share in cash, subject to certain minor adjustments. The transaction will result in the Company becoming a private company.
>
> The Manager of Maverick is Eric Persson. An affiliate of Maverick owns the Wendover Nugget Hotel & Casino and Red Garter Hotel & Casino in Wendover, Nevada, along with various other assets.
>
> Maverick intends to fund the transaction primarily with debt financing from Nevada State Bank plus equity financing from Maverick. The transaction is not subject to a financing condition.
>
> William Sherlock, Chairman of Nevada Gold, said "Our goal was to obtain the highest value in a sale of the Company. We believe the transaction announced today achieves our objective and provides immediate cash consideration for our shareholders."
>
> The transaction is subject to approval of a majority of the shareholders of Nevada Gold, the approval of applicable gaming authorities, completion of the sale of the Company's Club Fortune casino in Henderson, Nevada, which is under contract,

> and other customary closing conditions. The companies expect the transaction to close by the end of 2018.
>
> The Company's Board of Directors has unanimously approved the merger agreement.
>
> Rossoff & Company, LLC is serving as financial advisor and Hughes Hubbard & Reed LLP is serving as legal counsel to the Company in connection with the transaction.

**C. The Materially Incomplete and Misleading Proxy Statement**

58. In order to convince Nevada Gold's stockholders to vote in favor of the Proposed Buyout, on December 3, 2018, the Individual Defendants authorized the filing of the Schedule PREM14A proxy statement with the SEC in connection with the Proposed Buyout (previously defined as the "Proxy" or "Proxy Statement"). As discussed below, the Proxy Statement omits and/or misrepresents material information that must be disclosed to Nevada Gold's stockholders to enable them to render an informed decision with respect to the Proposed Buyout.

***1. Material Misstatements and/or Omissions Regarding the Projections for Nevada Gold***

59. First, the Proxy Statement fails to provide ***any*** of the Company's financial projections that were relied upon by the Board, Nevada Gold, and RCO in performing their respective valuation analyses in connection with the Proposed Buyout. Specifically, the Proxy Statement discloses that, in performing its financial analyses, RCO reviewed, among other things, "financial projections prepared by the management of the Company relating to the Company for the fiscal years ending April 30, 2019 through 2022." Proxy Statement, 43.

60. Furthermore, in connection with RCO's *Restructuring and Share Repurchase Analysis,* the Proxy discloses that the Company's "pro forma EBITDA for the 2019 fiscal year" was utilized by RCO in performing the analysis, yet these projections were, again, not disclosed. Similarly, in connection with RCO's *Discounted Cash Flow Analysis*, the Proxy discloses that

RCO estimated the present value of the free cash flows of the Company through the fiscal quarter ending October 31, 2018 "based on the average of the Company management's 'best case' and 'worst case' financial projections," yet these projections were, again, not disclosed.

61. Management projections are plainly material to stockholders when deciding whether to vote for a merger, particularly an all-cash merger such as the Proposed Buyout. Such projections are critical for shareholders to assess the fairness of the consideration they have been offered.

62. The *complete omission* of the Company's projections rendered the summaries of RCO's valuation analyses that relied on such projections (Proxy Statement, 44-48) and the statements throughout the Proxy Statement that the $2.50 per share Merger Consideration is "fair, from a financial point of view" to the Company's shareholders materially incomplete, false, and/or misleading.

### ***2. Material Misstatements and/or Omissions Regarding RCO's Financial Analyses***

63. As noted above, the Proxy discloses that, at the June 6 Board Meeting, "the Board also reviewed and discussed with RCO the report that RCO had prepared, at the request of the Board, and provided to the Board in advance of the June 6 Board Meeting, which set forth an analysis of the probable impact, including forecasted stock valuations, of a restructuring of the Company on a stand-alone-basis, assuming the disposition of Club Fortune and the relocation of the Company's headquarters to the State of Washington" (previously defined as the "June 6 Analysis"). Proxy Statement, 24. However, the Proxy does not appear to clearly disclose this Analysis.[2]

---

[2] While the Proxy does disclose a "Restructuring and Share Repurchase Analysis," the assumptions of that analysis appear to differ from the description of the June 6 Analysis and the Proxy does not

64. In addition, the Proxy fails to disclose whether and to what extent the April 30, 2019 through 2022 projections differ from the projections that form the basis of the June 6 Analysis.

***3. Material Misstatements and/or Omissions Regarding the Sales Process***

65. Finally, the Proxy Statement fails to disclose certain material information regarding the process that resulted in the Proposed Buyout.

66. First, the Proxy fails to disclose information sufficient to enable Nevada Gold stockholders to evaluate whether and to what extent RCO suffered from any potential conflicts of interest in connection with the Proposed Buyout. The Proxy discloses that:

a. The Company agreed to pay RCO a fee in the amount of 1) "$150,000 upon the execution of the engagement agreement," 2) "an additional $150,000 upon signing a definitive agreement in connection with a transaction including the sale of all or part of the Company and the delivery by RCO to the Company of a fairness opinion with respect to such transaction," and 3) a "success fee . . . upon the consummation of such transaction equal to 2.0% of the total consideration paid for part or all **off [sic] the Company**, including assumption of indebtedness, if any." Proxy Statement, 48 (emphasis added).

b. Pursuant to an additional engagement agreement between the Company and RCO, the Company agreed to pay RCO an additional success fee upon the consummation of the sale of Company's Club Fortune, again "equal to 2.0% of the total consideration paid **for the Company**." Proxy Statement, 48 (emphasis added).

c. And, "[s]ince 2009, the Company has paid RCO a reoccurring quarterly advisory

---

clearly identify the June 6 Analysis as the disclosed "Restructuring and Share Repurchase Analysis.

fee of $25,000 for financial advisory services provided to the management of the Company and the Board of Directors by RCO." Proxy Statement, 49.

67. As an initial matter, the Proxy must clarify the aggregate value of the success fees RCO stands to receive upon consummation of the sales of Nevada Gold and Club Fortune. This is especially so where a payment structure contemplating only one such success fee would, on its own, call into question the objectivity of RCO's fairness opinion. As currently written, however, the Proxy leads Nevada Gold stockholders to believe that RCO stands to receive two separate success fees, ***with each being equal to 2.0% of the total consideration paid for the Company*** – a bizarre, if not unprecedented, arrangement. Given that the Merger Consideration "implie[s] an enterprise value of approximately $44,838,000[,]" such payments would amount to, in the aggregate, $1,693,520,[3] or nearly ***six times*** the $300,000 RCO stands to receive upon execution of the Merger Agreement and delivery of its fairness opinion. Proxy Statement, 48. What is more, under such a payment structure, RCO would stand to receive fees amounting to ***more than*** 4.0% of the total consideration paid for the Company – an amount that, if accurate, is clearly excessive and could give rise to a significant conflict of interest on RCO's part.

68. Put simply, a reasonable stockholder would want to know an important economic motivation of the negotiator employed by the Board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to it, given its overall economic interest, than only executing a deal at the right price. This is especially so, where, as here, RCO is providing a fairness opinion for a repeat client, as it may be influenced to find a transaction fair to avoid

[3] This figure takes into account that, with respect to one of the success fees, the "quarterly retainer fees payable to RCO between February 14, 2018 and December 31, 2018 shall be credited again [sic] the success fee." Proxy Statement, 48.

irritating management and other corporate actors who stand to benefit from the transaction, as this will ensure future lucrative business.

69. In addition, the Proxy fails to disclose whether and to what extent RCO has performed financial advisory services for Maverick or any of its affiliates in the two years that preceded the Merger Agreement. In light of the omissions and atypical payment structure described above – each calling into question the objectivity of RCO's opinion and its underlying analyses – this information is especially material.

70. In addition to those issued, and as noted above, the Proxy also fails to disclose:

a. All bids received for Club Fortune;

b. Whether and to what extend the June 6 Analysis was provided to Stockholders 1-4;

c. The substance and nature of Bidder 2's response to RCO's July 24, 2018 request for best and final proposals and whether that response included a proposed price; and

d. Whether the Board sought input from Stockholders 1-4 on whether and to what extent they were in favor of proceeding on a stand-alone basis in lieu of a sale.

71. The Proxy Statement is materially incomplete and misleading because it omits the information identified above. Defendants, separately and together, in connection with the Proposed Buyout are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and due care owed to Plaintiff and other public stockholders of Nevada Gold.

## COUNT I

**On Behalf of Plaintiff and the Class Against Nevada Gold and the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

72. Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

73. Defendants have issued the Proxy Statement with the intention of soliciting stockholder support for the Proposed Buyout. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, among other things, the key inputs and assumptions of the financial analyses performed by RCO in support of its fairness opinion and the projections used by RCO in support thereof.

74. In so doing, defendants made untrue statements of fact and omitted to state material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

75. SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

76. During the relevant period, Defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

77. Specifically, and as detailed above, the Proxy Statement violates Section 14(a) and Rule 14a-9 because it omits material facts concerning certain material information regarding key inputs and assumptions underlying RCO's financial analyses and the projections used by RCO in

support thereof.

78. Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Buyout; indeed, the Proxy Statement states that RCO reviewed its financial analyses with the Board and that the Board considered the financial analyses provided by RCO in its fairness opinion. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading.

79. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Buyout. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

80. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

81. Unless Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

82. Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is

corrected.

**COUNT II**

**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

83. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

84. The Individual Defendants acted as controlling persons of Nevada Gold within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Nevada Gold, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

85. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Buyout. They were, thus, directly involved in the making of this document.

87. In addition, as the Proxy Statement sets forth at length, and as described herein, the

Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

88. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

89. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

90. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict. Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Buyout, unless and until the Company discloses the material information discussed above that has been omitted from the Proxy Statement;

C. In the event Defendants consummate the Proposed Buyout, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D. Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

January 3, 2018

Respectfully submitted,

**MUCKLEROY LUNT, LLC**

By: */s/ Martin A. Mucklroy*
Martin A. Muckleroy
Nevada Bar No. 9634
6077 S. Fort Apache Rd., Ste. 140
Las Vegas, NV 89148
Tel.: (702) 907-0097
E-mail: martin@muckleroylunt.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina, Esq.
Christopher R. Tillotson, Esq.
1100 Poydras St., Suite 3200
New Orleans, LA 70163
Tel.: (504) 455-1400
Fax: (504) 455-1498
E-mail: Michael.Palestina@ksfcounsel.com
Christopher.tillotson@ksfcounsel.com

*Attorneys for Plaintiff*